## [No. 3525.]

### Felix Wright v. The State.

1. CIRCUMSTANTIAL EVIDENCE.— CHARGE OF THE COURT must expound to the jury the law controlling circumstantial evidence when that species of proof is the only inculpatory evidence adduced by the State.

2. THEFT — "TAKER" — EVIDENCE.— Legally to convict for theft, the State must prove that the accused was a *taker* of the property.  To constitute him a *taker*, it is not necessary that he be personally present at the place and time of the actual taking; provided that, at the time of the taking, he is doing something in aid of his co-conspirator who does the actual taking,— as by keeping watch, etc.  If the theft was complete before he had any connection with the stolen property or the transaction, he is neither a principal nor an accomplice in the theft, but may inculpate himself as a receiver of stolen property, knowing it to have been stolen.

APPEAL from the District Court of Falls.  Tried below before the Hon. B. W. Rimes.

The indictment charged the appellant and one Steve Blakely with the theft of a cow, a yearling and a two-year-old heifer from the possession of Loyd Barnes, the owner, on December 5, 1883.  A term of two years in the penitentiary was the penalty assessed against appellant.

Loyd Barnes was the first witness for the State.  He testified that on December 5, 1883, he lived on Deer creek in Falls county, Texas, and owned a bunch of ten or twelve head of cattle, which ranged about his place.  He had known the defendant some four or five years, during a portion of which time he lived within a few hundred yards of the witness.  The cattle were all in the recorded mark and brand of the witness, but witness knew them quite as well by their flesh marks.  Early in December, 1883, the witness moved from that place to another a few miles distant.  Having removed most of his

household goods, he returned for his cattle, and for the first time missed them from their accustomed range. The witness, in company with others, made a thorough but unsuccessful search throughout the range for the missing cattle. Within a day or two after he abandoned the search, the witness received information to the effect that the cattle had been stolen, and, in company with other parties, went to Durango in Falls county to recover them. Arriving at Durango, which was some ten miles distant from the defendant's then residence, the witness failed to find the cattle, but received information that caused him to proceed to Mooreville, some five miles further. In a herd near that point, the witness found the three animals described in the indictment. Witness recognized these animals from some distance, and before he got to them. His son, Tom Barnes, was with him. The herd in which the animals were found belonged to Mr. J. T. Twyman, who was there in charge. Twyman, seeing the witness looking at the cattle, asked the witness if there was anything wrong with them. Witness told him that he, Twyman, had three head of his, witness's, cattle in that herd, and that he had come for and wanted them. Twyman told witness to point them out, and when witness did so Twyman surrendered them, telling witness who he got them from. This was on the 5th day of December, 1883.

The defendant and Steve Blakely, young men of apparently the same age, lived near each other on Mark Harrell's place, in Falls county, about three quarters of a mile distant from where the witness lived at the time of the theft. They had lived near each other for four or five years, and were intimate friends. Both of them knew the witness's cattle, and were familiar with both his mark and brand. The witness asserted that they knew the cattle, the mark and the brand, because they had ample opportunity to know them. In 1882, the defendant lived at his father-in-law's house, which was near the witness's cow pen. About the time that the cattle were found and recovered, the defendant left the county and was gone for several months. Witness did not know where he went. So far as the witness knew, the character of the defendant for honesty, prior to the theft of these animals, was good. When informed of defendant's connection with these cattle, the witness was very much surprised. Witness knew that the officers instituted search for the defendant after the theft of these cattle, and saw him next, after the cattle were stolen, under arrest upon the charge of being concerned in the theft.

J. T. Twyman was the next witness for the State. He testified that he knew the defendant and Steve Blakely. Witness lived in

Durango in the year 1883, and was engaged in the cattle business. Early in the month of December of that year Blakely came to him and told him that he had brought with him some cattle, leaving them in the McClatchel pasture, about two miles out from Durango. These cattle he proffered to sell to the witness. Defendant was with Blakely, but had nothing to say throughout the whole transaction. Witness went with defendant and Blakely to the McClatchel pasture, examined and bought the cattle on the agreement of Blakely and defendant to drive them to witness's herd at or near Durango. This was about sundown. Blakely and defendant drove the three head of cattle — a cow branded N S, a yearling and a heifer — to Durango, and put them in Jackson's pasture. This was accomplished about one hour after dark. Witness, defendant and Blakely then went to the drug store near by, to get some paper on which to write a bill of sale, and money with which to make payment. Witness paid, if he remembered aright, $30 to Steve Blakely for the three animals. Witness wrote out the bill of sale and asked if both parties were to sign it, and Blakely replied in the affirmative. Both signed the bill of sale, in the presence of witnesses, using their marks. This, the witness thought, occurred on Tuesday night. During the same week the witness started a herd of cattle to Waco. When he got with them to Mooreville, a small village in Falls county, five or six miles from Durango, witness met Loyd Barnes and his son Tom, who claimed the cow, yearling and heifer which the witness had purchased from Blakely and the defendant. Upon their identification of the cattle, witness surrendered them, and the two Messrs. Barnes drove them off in the direction of their home.

The bill of sale signed by Blakely and the defendant was in court on the former trial of this cause, and was left in court among the papers of the cause; but after a diligent search cannot now be found. Blakely was the spokesman throughout the transaction respecting the sale of these animals to the witness. Defendant said nothing in regard to the cattle or the trade, but was present all of the time. He made no claim to any interest whatever in the cattle, and did not receive from the witness a cent of the money paid for them. The witness had previously purchased cattle from Steve Blakely.

Tom Barnes, son of the prosecuting witness, was next introduced by the State. He testified that he was with his father when, on the 5th day of December, 1883, he recovered the animals described in the indictment from the herd of J. T. Twyman, near Mooreville in

Falls county. Witness knew the animals well,— had often milked the cow, and had known the other two from the time they were calved. Witness saw these cattle on their accustomed range near his father's house on the Sunday evening next before they were missed on Monday. Witness made search for them on the Monday alluded to, but failed to find them. Witness was absolutely certain that Blakely and defendent both knew his father's cattle perfectly well, because he had often seen them about the said cattle, and because the defendant had lived four or five years in the immediate neighborhood of the witness's father, more than a year of which time he lived within a few hundred yards of a cow pen that was much frequented by his father's few head of cattle. During the period last spoken of, the identical cow described in this indictment as one of the stolen animals was much troubled with screw worms, and the defendant personally aided the witness in curing her. Witness had often seen the defendant driving Loyd Barnes's cattle out of his field. Both the defendant and Blakely lived on the Mark Harrell place during the year 1883, and to the positive knowledge of the witness they were intimate associates and friends. When the cattle described were recovered, the defendant and Blakely left the country, and witness saw them no more until after their arrest upon this charge. Blakely, so far as witness knew, owned no cattle other than a yoke of oxen he purchased from the witness's father. The defendant owned no cattle of his own, and was not engaged in handling cattle.

Constable A. R. Tucker testified, for the State, that he was in Doctor Moore's drug store in Durango when the defendant and Blakely, after they delivered the cattle to Twyman, came with Twyman to the drug store to close the transaction. Witness heard Twyman ask if both defendant and Blakely were to sign the bill of sale; heard Blakely answer in the affirmative, in the presence of the defendant; saw both defendant and Blakely sign the bill of sale, and then signed it himself as a witness. He also saw Twyman pay the purchase money, of which he paid a part to defendant and a part to Blakely.

Ike Peevey, for the State, testified that he saw the defendant and Blakely sign the bill of sale to Twyman, by making their marks. He saw Twyman pay the purchase money, but did not remember whether he paid the money in whole to Blakely or in part to each. Witness understood, by all that was said by the parties, that the cattle were being sold by both defendant and Blakely.

W. G. Etheridge testified, for the State, that he had known the

defendant for the last five or six years, during which time he and witness had lived in the same immediate neighborhood. He also knew Steve Blakely, who had lived in that neighborhood all of his life. Blakely and defendant lived near to each other, were intimate associates and friends, and were often together. Loyd Barnes, who lived in the same neighborhood, owned a few head of cattle. Witness was satisfied that, having ample opportunity, the defendant and Blakely both knew the few head of cattle owned by Barnes.

Cross-examined, witness said that during his long acquaintance with the defendant he had often had him in his employ, and always found him a good hand. He had never, prior to this charge, heard the defendant's character for honesty questioned. Witness had never known of Steve Blakely owning cattle. Witness lived within four or five hundred yards of Loyd Barnes's house, but did not know Barnes's cattle, nor his mark and brand. Witness did not know the cattle of any of his neighbors save two or three cows that belonged to Sam Landrum, who lived within two or three hundred yards of witness, and he only knew them because of the fact that they are frequently at his cow pen. Witness did not know Landrum's other cattle, nor did he know Landrum's mark and brand. Witness never heard of the defendant being accused of theft or dishonesty prior to this charge, and considered his reputation in this respect above reproach. Witness declined to swear outright that defendant knew the Barnes cattle.

Calvin Reeves testified, for the State, that he lived on Deer creek near the residence of Loyd Barnes. He had long known the defendant and Blakely, and knew that they lived near together in the same neighborhood, and were intimate associates and friends. They had both lived long in the immediate neighborhood of Barnes, and had every opportunity to know, and, in the opinion of the witness, did know, Barnes's cattle. Defendant and Blakely left the county about the time the cattle were found, and did not return until they were arrested for the theft.

Cross-examined, the witness said that, prior to this charge, the defendant's character for honesty was good, so far as he knew. That of Steve Blakely was bad.

Deputy-sheriff Hunnicutt testified, for the State, that writs were placed in his hands for the arrest of Blakely and defendant very shortly after Barnes's cattle were recovered from Twyman. Search through the county failed to disclose their whereabouts. The search was diligent and protracted. Several months elapsed before their capture was effected. The State closed.

Mark Harrell was the first witness for the defense. He testified that he was well acquainted with the defendant and Steve Blakely, both of whom lived on witness's place during the year 1883. Some time about the last of November of that year, Steve Blakely and one Ossy Forbes brought three head of cattle to the witness's place and turned them into the witness's field. These cattle were driven to witness's place by Blakely and Forbes, on the Friday evening next before the alleged theft of Barnes's cattle. Blakely applied to the witness for the loan of $10. Witness told him that, having a day or two previously paid the defendant $60 for work, he had no money, but that doubtless defendant could accommodate him. Blakely did apply to defendant, and obtained $10, to secure the payment of which he executed to the defendant a mortgage or bill of sale to one of the three animals,— the yearling,— the under- standing between them being that if the money was not repaid within a specified time, the title to the yearling should vest abso- lutely in the defendant.

On the day following this transaction, the witness went through his field and saw the animals described. On the next day, Sun- day, he saw Blakely and Forbes driving the same cattle past his, witness's, house, but did not know their destination. Defendant was not with the parties named, nor was he at witness's place when Blakely and Forbes first came there with the cattle. Ossy Forbes was Loyd Barnes's son-in-law. The mortgage or bill of sale from Blakely to defendant was written by the witness, and signed·by Tom Ellison as a subscribing witness. Defendant had never been engaged in handling or driving cattle to any great extent, and at the time he got into this trouble he was working for witness as a farm hand. Defendant was in the field at work when Blakely and Forbes first brought the cattle to witness's place. On the Monday following, the witness sent for defendant by Tom Ellison, to come to his house to do some work- He sent word to witness by Ellison that he could not comply, as he had engaged with Blakely for that day to drive the cattle, and had been paid $1 by Blakely to perform that service.

Tom Ellison testified, for the defense, that he lived on Mark Har- rell's place; that he was present and saw the defendant lend Steve Blakely $10, to secure the payment of which Blakely executed a mortgage or bill of sale to a yearling, and witness signed the paper as an attesting witness. He saw Blakely and a party whose name he afterwards ascertained was Ossy Forbes when they brought the three head of cattle to Harrell's place. He afterwards saw those

same parties in possession of the cattle, in the presence of the defendant. He went to get defendant to do some work for Mr. Harrell on Monday following the money and mortgage transaction, but defendant did not engage with Harrell, saying that Blakely had employed him for that day to aid him in driving the cattle. Blakely and defendant lived on the same place, and were perfectly well acquainted with each other. The defense closed.

The State recalled J. T. Twyman, who testified that upon a former trial of this case, September 11, 1884, he met the defendant in Marlin, and had a conversation with him about this cattle transaction. He asked the defendant if he did not think it was hard for him to lose both the cattle and the money he had paid for them. Defendant replied that he did think so. Witness then asked defendant if he did not think he ought to refund. The defendant replied that he had no money. Witness then told him that he would take his note, signed by Haden Smith as security. Defendant agreed to this, sought out and conferred with Haden Smith, and shortly joined witness, when the two executed the following note, for just half the amount paid by witness for the cattle:

"Marlin, Falls County, Texas.

"On the first day of October, 1885, we promise to pay to Twiman & Hailey, sixteen dollars and 35 cents, for value received, with 12 per cent. interest from date until paid. This 11th Sept., 1884.

(Signed)                    "Felix ⋈ Wright,
"Haden ⋈ Smith."

"Witness: Thos. D. Williams."

The motion for new trial presented the questions discussed in the opinion.

No brief for the appellant has reached the Reporters.

*J. H. Burts*, Assistant Attorney-General, for the State.

Hurt, Judge. This is a conviction for the theft of the cattle of Loyd Barnes. Upon circumstantial evidence alone the State relied and obtained the conviction in the case. The law applicable to such a case was not given in charge to the jury, wherefore counsel for appellant excepted and reserved his bill of exceptions. This was error. (*Brown* v. *The State*, 23 Texas, 195; *Cave* v. *The State*, 41 Texas, 182; *Hunt* v. *The State*, 7 Texas Ct. App., 212; 9 Texas Ct. App., 105; Id., 275; Id., 299; Id., 476; 10 Texas Ct. App., 293; Id., 485; Id., 507; 12 Texas Ct. App., 283; Id., 657; 13 Texas Ct. App.,

51; Id., 309, 493, 669; 14 Texas Ct. App., 96, 312; 16 Texas Ct. App., 144, 237, 258, 341.)

There was evidence adduced upon the trial strongly tending to prove that appellant was a hired hand, and that his connection with the cattle grew out of this fact. Upon this phase of the case the court instructed the jury, but in such manner as may have impressed their minds with the belief that if defendant as a hired hand assisted Steve Blakely in driving the cattle, knowing them to have been stolen, after they were actually stolen by Blakely, he would be guilty. We are not certain that the charge of the court was calculated to have this effect upon the jury, but we deem it proper here to make these observations:

1st. No person can legally be convicted as a principal in theft unless he took the property. To constitute him a taker it is not necessary that he should be present at the time and place when the property was taken. If not present, he must be keeping watchout, or when the property was taken he must be doing the part of the work assigned him in connection with the plan of the conspirators, and in furtherance of the common purpose. In other words, to make a person a principal in theft he must be the taker, or he must be present aiding others, etc., or keeping watch when the property was actually taken; or, if not present or keeping watch, he must be doing something in aid of those who are present, or doing something in furtherance of the common design. He must be engaged in doing these things at the time the property was taken. (*Cook* v. *The State*, 14 Texas Ct. App., 96; *O'Neal* v. *The State*, Id., 582.)

Again: if the theft was complete before a party had any connection with the transaction, he is neither an accomplice nor a principal. Then, if appellant assisted Blakely in driving the cattle after he (Blakely) had stolen the same, appellant would not be guilty of *theft*, though he may have known that Blakely had stolen the cattle. If guilty, it would be of receiving stolen property, knowing the same to have been stolen.

It is passing strange, indeed, that these questions should ever be permitted to arise in a case. For, if there is the least doubt as to whether a party is a principal, accomplice, accessory or a receiver, in such cases counts should be inserted for each, and all of these nice questions will thus be eliminated from the case.

Because the court failed to charge the law applicable to a case of circumstantial evidence, the judgment is reversed and case remanded.                          *Reversed and remanded.*

[Opinion delivered June 6, 1885.]